UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/13/2020
```

-------------------------------------------------------------------X

CITY OF PROVIDENCE, RHODE ISLAND, et al.,

                                        Plaintiffs,

                    -v-

ABBVIE INC., et. al.,

                                        Defendants.

                                                                X

-------------------------------------------------------------------

20-cv-5538 (LJL)
20-cv-7352 (LJL)
20-cv-5735 (LJL)
20-cv-7110 (LJL)
20-cv-5837 (LJL)
20-cv-5813 (LJL)
20-cv-7492 (LJL)
20-cv-5826 (LJL)
20-cv-7309 (LJL)
20-cv-5735 (LJL)
20-cv-5813 (LJL)
20-cv-5901 (LJL)
20-cv-5826 (LJL)
20-cv-6769 (LJL)
20-cv-7177 (LJL)
20-cv-6647 (LJL)
20-cv-7296 (LJL)
20-cv-7304 (LJL)

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:

Before the Court are applications from various plaintiffs' counsel seeking appointment as Interim

Lead Counsel/Interim Co-Lead Counsel to represent the interests of the proposed End-Payor

class, and a single application for appointment as Interim Lead Counsel to represent the interest

of the proposed Direct Purchaser class, pursuant to Federal Rule of Civil Procedure 23(g).

The Court appoints Sharon K. Robertson of Cohen Milstein Sellers & Toll LLC ("Cohen

Milstein") and Robin van der Muelen of Labaton Sucharow LLC ("Labaton Sucharow")

(together the "Cohen Milstein Group") as Interim Co-Lead Class Counsel.  The Court denies the

motion to appoint Interim Co-Lead Class Counsel in the Direct Purchaser actions.

## I.    Background

The applications before the Court arise from a set of related lawsuits pending before the Court relating to allegations that Defendants engaged in an illegal scheme to delay competition in the United States and its territories from generic versions of Bystolic®, a prescription medication containing the active pharmaceutical ingredient nebivolol hydrochloride[1] and approved by the U.S. Food and Drug Administration ("FDA") for the treatment of hypertension.

There are two sets of lawsuits before the Court.  The first set of lawsuits comprises two actions brought by a single Corporation, J M Smith Corporation, filed on July 23, 2020 and September 1, 2020 respectively, which was a direct purchaser of Bystolic and generic equivalents bringing federal antitrust claims on behalf of a putative class of persons or entities who purchased Bystolic directly from any drug manufacturer.[2]  The second set of actions, filed shortly thereafter, is brought by indirect purchasers of Bystolic, which include consumers, health insurers, and welfare plans ("End-Payors").[3]  Beginning on July 17, 2020, and continuing until September 12, 2020, 13 different End-Payor lawsuits were filed in this court, each on behalf of one or multiple corporate entities or individuals seeking to represent a class of persons and

---

[1] The Complaints uses "nebivolol" and "nebivolol hydrochloride" interchangeably.

[2] *J M Smith Corp. v. Forest Laboratories Inc.*, No. 20-cv-5735 (S.D.N.Y. 2020); *J M Smith Corp. v. Watson Pharma, Inc.*, 20-cv-7110 (S.D.N.Y. 2020) (together, "Direct Purchaser Actions").

[3] *City of Providence, Rhode Island. v. AbbVie Inc.*, No. 20-cv-5538 (S.D.N.Y. 2020); *UFCW Local 1500 Welfare Fund v. AbbVie Inc.*, No. 20-cv-5837 (S.D.N.Y. 2020); *Teamsters Local 237 Welfare Fund v. AbbVie Inc.*, 20-cv-5813 (S.D.N.Y. 2020); *Mayor and City Council of Baltimore v. AbbVie Inc.*, No. 20-cv-5826 (S.D.N.Y. 2020); *Law Enforcement Health Benefits, Inc. v. AbbVie Inc.*, 20-cv-5901 (S.D.N.Y. 2020); *Teamsters Western Region & Local 177 Health Care Plan v. AbbVie Inc.*, 20-cv-6647 (S.D.N.Y. 2020); *John Wilder v. AbbVie Inc.*, No. 20-cv-6769 (S.D.N.Y. 2020); *Katherine Chinnery v. AbbVie Inc.*, No. 20-cv-7177 (S.D.N.Y. 2020); *York Keels v. AbbVie Inc.*, No. 20-cv-7309 (S.D.N.Y. 2020); *Angela Maffei v. AbbVie Inc.*, No. 20-cv-7296 (S.D.N.Y. 2020); *Fraternal Order of Police, Miami Lodge 20 Ins. Trust Fund v. AbbVie Inc.*, 20-cv-7304 (S.D.N.Y. 2020); *Nina Cook v. AbbVie Inc.*, 20-cv-7352 (S.D.N.Y. 2020); *Richard Malek v. AbbVie Inc.*, 20-cv-7492 (S.D.N.Y. 2020) (together, "End-Payor Actions").

entities in the United States and its territories that purchased, paid and/or provided

reimbursement for some of all of the purchase price of Bystolic, other than for resale, indirectly

(i.e. did not purchase Bystolic directly from Defendants or their affiliates.).

   Each of the lawsuits is based on substantially identical facts, although the claims differ

between the Direct Purchaser Actions and the End-Payor Actions: the former bring claims

seeking damages under federal antitrust law while the latter bring claims under state antitrust,

consumer protection, and unjust enrichment laws for damages and under federal antitrust law for

injunctive relief only.  In both sets of cases, Plaintiffs seek to recover damages arising from

Forest's alleged unlawful agreements with Hetero USA, Inc. and Hetero Labs Ltd. ("Hetero");

Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc. ("Torrent"); Alkem Laboratories Ltd.

("Alkem"); Indchemie Health Specialties Private Ltd. ("Indchemie"); Glenmark Generics Inc.,

USA, Glenmark Generics Ltd., and Glenmark Pharmaceuticals S.A. ("Glenmark"); Amerigen

Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. ("Amerigen"); and Watson Pharma,

Inc. and Watson Pharmaceuticals, Inc. ("Watson") (collectively the "Settling Generics") not to

compete in the market for Bystolic in the United States and its territories.  *See City of Providence*

*v. AbbVie Inc* No. 20-cv-5538, Dkt. No. 1 (S.D.N.Y. July 17, 2020).[4]

   Bystolic is a beta blocker.  It blocks the effects of the hormone epinephrine, thereby

causing the heart to beat more slowly and with less force, which in turn lowers blood pressure.

*Id.* ¶ 1.

   In December 2011—as soon as it was possible to do so—seven drug companies

filed applications for FDA approval of generic versions of Bystolic.  *Id.* ¶ 2.  In March 2012,

---

[4] Because the allegations in the End-Payor actions are substantially identical, the Court draws the
below allegations from the first-filed case.

Forest sued them for infringement of U.S. Patent No. 6,545,040 (the "'040 patent"). *Id.* ¶ 5. Each generic company contended that its generic would not infringe the asserted patent claims or the claims were invalid.

The complaints allege that the generic companies' position in the patent litigation was very strong. *Id.* ¶ 7. An earlier patent had disclosed a nebivolol compound with a mixture of stereoisomers—different three-dimensional shapes of an organic compound—so the '040 patent could not claim a nebivolol compound with the same mixture, or else it would be invalid for anticipation. *Id.* ¶¶ 104-105. But the generic companies' drug products contained the disclosed mixture of stereoisomers. Thus, the argument is, either their products did not infringe the '040 patent, or the '040 patent was invalid.

Nonetheless, between October 2012 and November 2013, Forest entered into settlement agreements with each of the Settling Generics, each of which required the Settling Generics to defer the launch of their generic Bystolic products until September 2021only three months before the expiration of the '040 patent. *Id.* ¶¶ 125-145.

In 2019, the reason that Forest was able to forestall competition for so long was revealed: these settlement agreements included large, unjustified payments to the Settling Generics in exchange for the Settling Generics' agreements not to compete in the market for Bystolic. According to documents in connection with Forest's Merger Agreement with Actavis, which became public in March 2019 in the course of a different lawsuit involving Forrest, *see Id.* ¶ 126, Forest's settlement agreements required Forest to pay *at least* $15 million to each generic company after February 2014—to say nothing of what Forest may have already paid the Settling Generics—and included side deals and reimbursement of the Settling Generics' litigation costs. *Id.*

4

Four of the Settling Generics obtained approval of their generic Bystolic products in 2015, and two obtained approval thereafter.  In June 2015, the last patent protecting Bystolic (other than the '040 patent) expired.  *Id.* ¶ 7.  It is asserted that the only reason that generic Bystolic did not enter the market in 2015 is Forest's unlawful pay-for-delay settlement with each Settling Generic.  Due to these settlements, purchasers allege they must pay higher prices for brand Bystolic until September 17, 2021.

The Direct Purchaser Plaintiff brings actions on its own behalf on behalf of a class of direct purchasers which includes all persons or entities in the united states who purchased brand or generic Bystolic from any drug manufacturer in the relevant period.  *J M Smith Corp. v. Forest Laboratories Inc.*, No. 20-cv-5735, Dkt. No. 1 ¶ 65.  As noted above, the End-Payor Plaintiffs bring actions on their own behalf and on behalf of classes of all similarly situated End-Payors.  End-Payors are the final link in the chain of distribution of pharmaceuticals; they include consumers and those who pay for any portion of the price the consumer does not pay for (*e.g.* insurers and health and welfare plans).  Defendants' alleged unlawful conduct has prevented generic nebivolol hydrochloride manufacturers from entering the market with competing generic products and has allegedly cost Plaintiffs in both classes and the Classes substantial overcharge damages.

On September 9, 2020, the Court received leadership applications from the following law firms (and individual counsel therein) seeking appointment as interim class or co-Lead class counsel on behalf of a putative End-Payor class: Cohen Milstein, *see Mayor and City Council of Baltimore v. AbbVie Inc.*, No. 1:20-cv-5826, Dkt. No. 38; Labaton Sucharow, *see UFCW Local 1500 Welfare Fund v. AbbVie, Inc*., No. 1:20-cv-5837, Dkt. No. 25; Motley Rice LLC, *see The City of Providence, Rhode Island v. AbbVie Inc.*, No. 20-cv-5538, Dkt. No. 27; Bernstein

Liebhard LLP, *see Wilder v. AbbVie Inc.*, No. 20-cv-6769, Dkt. No. 11; Grant & Eisenhofer P.A,
*see Law Enforcement Health Benefits, Inc. v. AbbVie Inc.*, No. 1:20-cv-5901, Dkt. No. 16.;
Girard Sharp LLP (with Glancy, Prongay & Murray LLP as liaison counsel), *see In re Bystolic
(Nebivolol Hydrochloride) Antitrust Litig.*, No. 1:20-cv-5538, Dkt. No. 25; and Berman Tabacco,
*see Teamsters Western Region & Local 177 Health Plan v. AbbVie, Inc.*, No. 1:20-cv-6647, Dkt.
No. 15.  The Court has also received the following four letters supporting two of the
aforementioned applications from the following counsel, each of whom represents a different
End-Payor Plaintiff: a letter from Spector, Roseman & Kodroff PC supporting the application of
the Cohen Milstein Group, *see Chinnery v. AbbVie Inc.*, No. 1:20-cv-7177, Dkt. No. 4; a letter
from Shepherd, Finkleman, Miller & Shah, LLP, also supporting the application of the Cohen
Milstein Group, *see Fraternal Order of Police, Miami Lodge 20 Ins. Trust Fund v. AbbVie Inc.*,
No. 1:20-cv-7304, Dkt. No. 7; a letter from Hach Rose Schirripa & Cheverie, LLP, also
supporting the application of the Cohen Milstein Group, *see Teamsters Local No. 1150
Prescription Drug Benefit Plan v. AbbVie, Inc.*, No. 20-cv-6223, Dkt. No. 11; and a joint letter
from The Joseph Savari Law Firm Inc., Edelson Lechtzin LLP, Grabar Law Office, Robbins
Geller Rudman & Dowd, LLP, and Meade Young LLC, supporting the application of Motley
Rice LLC and Bernstein Liebhard LLP, *see The City of Providence, Rhode Island v. AbbVie,
Inc.*, No. 1:20-cv-5538-LJL, Dkt. No. 29.

Also on September 9, 2020, the Court received an application from the law firm Gerstein
& Fisher LLP and Berger Montague PC seeking appointment as co-lead class counsel on behalf
of Direct Purchasers, as well as the appointment of an executive committee.  *J M Smith Corp. v.
Forest Laboratories LLC*, No. 20-cv-5735, Dkt. No. 45.

## II.       Discussion

### A. Legal Standard

Under Federal Rule of Civil Procedure 23(g)(3) ("Rule 23(g)(3)"), the Court is authorized to "designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3); *see also* Fed. R. Civ. P. 23(g)(2)(A) committee note (discussing and allowing the designation of interim counsel prior to a decision on class certification). Such an order serves an important purpose in an appropriate case. Particularly when there are competing complaints, the appointment of interim counsel "clarifies responsibility for protecting the interests of the [putative] class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Manual for Complex Litigation (Fourth) § 21.11 (2004) ("MCL"). Judges in this District have noted that, "When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g)(1)(A)." *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (S.D.N.Y. 2008) (citing *In re Air Cargo Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006)); *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2011 WL 5980198, at *2 (S.D.N.Y. Nov. 29, 2011) ("The consideration set out in Rule 23(g)(1)(A), which govern the appointment of class counsel once a class is certified, are widely accepted to apply to the designation of interim class counsel before certification as well.").

Rule 23(g)(1)(A) sets forth four factors that the Court must consider in appointing a class counsel once a class has been certified:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

and (iv) the resources that counsel will commit to representing the class

Fed. R. Civ. P. 23(g)(1)(A).  When multiple lawyers or firms submit applications to be made

lead counsel and "more than one choice of counsel satisfies these requirements for adequacy,

Rule 23(g)(2) provides that the court 'must appoint the applicant best able to represent the

interests of' the plaintiffs."  Opinion & Order Regarding Appointment of Interim Co-Lead

Counsel, *In re Interest Rates Swaps Antitrust Litig.*, No. 16-MD-1704 (S.D.N.Y. Aug. 3, 2016)

(citing *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. at 186).

In addition to these compulsory factors, Rule 23(g)(1)(B) also provides that the Court

"may consider any other matter pertinent to counsel's ability to fairly and adequately represent

the interests of the class."  This necessarily requires a judgment call by the Court, as most—if

not all—applicants are highly qualified. Oftentimes, the decision may be influenced by factors

such as whether there are clear guidelines for compensation and whether the designated counsel

can fairly represent the various interests in the litigation, particularly when diverse interests

exists within the class or parties.  MCL § 10.224.  It ultimately falls to the Court to make a

judgment with respect to the foregoing factors as to which applicant for lead counsel is best

equipped to lead and represent the putative class's interests.  The lodestar, however, always

remains the best interests of the class of plaintiffs.  In essence, the Court is sitting in as a

fiduciary, through choice of counsel, protecting the interests of those absent class members on

whose behalf counsel will be prosecuting the case and settling or compromising their rights.

### B.  End-Payor Co-Lead Class Counsel

All counsel who submitted leadership applications boast impressive and significant

experience in litigating pharmaceutical class claims.  Each appears to have deep knowledge not

only of class action law and procedure, but also of substantive antitrust law—particularly in the

pharmaceutical space.  Each pledges to commit the necessary human and financial resources to this litigation through its conclusion and to invest the necessary time and financial resources to ensure the efficient and successful resolution of this case on behalf of the class.  The competing applicants have those resources.

Although the question is close, the Court determines that the Cohen Milstein Group is best able to represent the interests of the putative class.

### 1. The work counsel has done in identifying or investigating potential claims in the action and the involvement of counsel in the litigation process.

The first Rule 23(g)(1)(A) factor requires the Court to consider the "work counsel has done in identifying or investigating potential claims in the action."  The Court also considers involvement in the early stages of the litigation.

Two competing applicants stand out for the work they have done in the early stages of the litigation—the Cohen Milstein Group and the joint application of Motley Rice LLC ("Motley Rice") and Bernstein Liebhard LLP ("Bernstein Liebhard") (together the "Motley Rice Group"). The Motley Rice Group claims to have first identified this case in June 2018 and filed the first End-Payor action.  *The City of Providence v. AbbVie Inc.*, No. 20-cv-5538, Dkt. No. 27.  It identifies the hours it has spent on the matter—150 hours—and recites that it prepared a consolidation motion for all Plaintiffs, a consideration which was mooted when this Court entered a similar order.  It also prepared and circulated organizational documents—a proposed Case Management Plan for all Plaintiffs' consideration and a letter to the Court regarding case management—and negotiated the disclosure of the relevant documents from the defendants.  *Id.*

The Cohen Milstein Group was not the first out of the block, but the ribbon does not always go to the fleetest of foot.  It may have been the more deliberate.  It filed the second and third End-Payor actions less than three weeks after the Motley Rice Group complaint, and it is

the only firm seeking a leadership position to have drafted, sent, and pled compliance with state law demand and notice requirements, a step which is necessary in some states to maintain a state antitrust claim.  *Mayor and City Council of Baltimore v. AbbVie Inc.*, No. 1:20-cv-5826, Dkt. No. 38 at 2; *Id.*, Dkt. No. 1 ¶¶ 217-21 (S.D.N.Y. 2020).  That may have avoided some unnecessary motion practice (and expense to the class) and may explain why it did not file more quickly.  *see In re Lipitor Anitrust Litig.*, 336 F. Supp.3d 395, 416 (D.N.J. 2018).  It points out that no End-Payor Plaintiff ("EPP") can claim originality with respect to the claims here; they followed on and largely tracked the allegations a lawsuit filed by J M Smith Corp., originally in the Northern District of California—which in turn were based largely on publicly filed documents.  *See id.* at 2.

The Cohen Milstein Group also says that it has led efforts to organize the EPPs, including by drafting and providing significant and substantive edits to filings and early case management documents, and to have worked with the Direct Purchasers to finalize a draft protective order and ESI protocol.  It states that it has coordinated between and among Plaintiff contingents and Defendants, and consulted with two experts to further develop the EPP's claims.  *Id.*

This factor speaks well to the respect and authority both the Cohen Milstein and the Motley Rice Groups have within both the plaintiff bar and with defense counsel.  The work done regarding organizational documents is relatively routine—that counsel were able to assume the roles they took reflects the view within the bar that they are each leaders.  Not surprisingly, each of the Cohen Milstein Group and the Motley Rice Group claim support of other lead plaintiffs— counsel in three of the other cases pending before this Court support the Cohen Milstein Group

application,[5] counsel in five others support the Motley Rice Group.[6] The factor does not tip

decidedly in favor of either group as the counsel best able to represent the interests of the class.

### 2. The necessary experience, expertise, and knowledge of applicable law to carry out this litigation.

The second and third factors address "counsel's experience in handling class actions,

other complex litigation, and the types of claims asserted in the action" and "counsel's

knowledge of the applicable law."  Fed. R. Civ. P. 23(g)(1)(A).  The Court considers them

together.

Although the question is close, these factors favor the Cohen Milstein Group.  The Cohen

Milstein Group notes that it has been involved in nearly every major pharmaceutical antitrust

case, especially "pay-for-delay" schemes like the one allegedly at hand.  *Mayor and City Council

of Baltimore*, No. 1:20-cv-5826, Dkt. No. 38 at 3.  It has secured the largest price-fixing verdict

in United States history and one of the largest recoveries on behalf of an End-Payor class in a

federal generic suppression case.[7]  *Id.*  The applications list participation in an impressive slate of

representative matters, including a number of so-called pay-for-delay pharmaceutical antitrust

---

[5] Spector Roseman & Kodroff PC write to the Court, "we believe the best choice to serve the End-Payors as Lead Counsel is Sharon K. Robertson of Cohen Milstein Sellers & Toll and Robin van der Meulen of Labaton Sucharow." *Chinnery*, No. 1:20-cv-7177, Dkt. No. 4.  Shepherd, Finkleman, Miller & Shah, LLP, meanwhile support the Cohen Milstein Group based on its history of working with both firms in pay-for-delay cases: "these exceptional lawyers and their firms have comprehensive knowledge of the pharmaceutical industry with extensive experience litigating pay-for-delay cases".  *Fraternal Order of Police, Miami Lodge 20 Ins. Trust Fund*, No. 1:20-cv-7304, Dkt. No. 7.

[6] The Joseph Savari Law Firm writes to the Court, "we believe the appointment of Mr. Buchman and Ms. Beige is in the interest of the class and the interest of justice. . . we are confident that they will provide the highest qualify representation to the class as well as excellent experienced leadership." *City of Providence v. AbbVie, Inc.*, No. 1:20-cv-5538-LJL, Dkt. No. 29.

[7] *In re Liboderm Antitrust Litig.*, No. 14-md-2521 (N.D. Cal. 2014). The firms' applications note that Cohen Milstein and Labaton Sucharow worked together as Co-Class Counsel in this $105 million recovery.

cases in which either Cohen Milstein or Labaton Sucharow (or both) have served as Lead or Co-Lead Class Counsel, demonstrating their long history of involvement in cases like the one before the Court.  *Id.*, 3, Ex. 1 at 9-10; *UFCW Local 1500 Welfare Fund*, No. 1:20-cv-5837, Dkt. No. 25 at 2-3.

      At least one of the lead lawyers for each of the two leading applicants for Interim Class Counsel has over a decade of experience litigating pharmaceutical antitrust cases.  But, in the case of the Cohen Milstein Group, both of the lead lawyers have substantial experience with pharmaceutical antitrust cases, including pay-for-delay cases.  Moreover, counsel also has experience with the intricate legal issues surrounding class certification likely to play an important role in this case.  Finally, and importantly, not only do the two firms demonstrate experience in handling pharmaceutical antitrust cases independently, but they also have an extensive history of litigating such cases together.  The firms mention five class action suits—three in the pharmaceutical space—in which they have worked together as Co-Lead Counsel.[8] That the firms have this experience working together gives the Court some confidence that counsel will handle the matter effectively and efficiently, without duplicative costs that ultimately might come out of any recovery for the plaintiff class in this case.

      The Court recognizes that one of the two lead lawyers for the Motley Rice Group appears to have been lead or co-lead counsel in more pay-for-delay cases than either of the proposed lead lawyers from the Cohen Milstein Group.  But, the determination of experience and knowledge,

---

[8] The firms' respective applications list the following cases: *In re Lidoderm Antitrust Litig.*, No. 14-md-2521 (N.D. Cal. 2014) (pharmaceutical generic suppression litigation); *In re Humira (Adalimumab) Antitrust Litig.*, No. 19-cv-01873 (N.D. Ill.) (same); *In re Opana ER Antitrust Litig.*, No. 14-cv-101150 (N.D. Ill.); *In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724 (E.D. Pa.); see also *In re Treasuries Sec. Auction Antitrust Litig.*, No. 15-md-2673 (S.D.N.Y.) (price-fixing suit involving U.S. Treasuries).

and thereby the determination of the counsel best able to represent the interests of the class, cannot be based on mere mechanical nose count alone.  Such exercise would cement forever as incumbent the lawyer who numerically had the most cases and result in counsel who had the most lead counsel appointments always getting the most lead counsel appointment at the expense of counsel who is at least equally qualified and presents a more compelling application.

### 3. Additional factors for consideration.

Two other factors warrant mention, although they are not outcome-determinative in this case.

First, each of the competing applicants highlight their commitment to diversity.  This is a relevant factor for the Court.  For well over a decade now, the courts have emphasized the importance of diversity in their selection of counsel.  *See, e.g.*, *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007) (recognizing a "diversity requirement"—that "at least one minority lawyer and one woman lawyer with requisite experience at the firm be assigned to this matter"); *see also In re Robinhood Outage Litig.*, No. 20-cv-01626-JD (N.D. Cal. July 14, 2020) (denying unopposed motion for appointment of lead counsel noting that all four of the proposed lead counsel are men and directing that leadership roles be provided to newer and less experienced lawyers); *Pub. Employees' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, 280 F.R.D. 130, 142 n.6 (S.D.N.Y. 2012) (noting the Court's Rule 23(g) conclusions "are subject to the Court being satisfied with. . . diversity in the class . . . and in the trial team); *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215 at *9 (S.D.N.Y. Mar. 7, 2011) ("In considering other matters pertinent to counsel's ability to fairly and adequately represent the class. . . diversity is a factor of central importance"); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 137–38 (E.D. La. 2013) (noting the importance of diversity in

appointment of lead counsel). *Cf. SEC v. Adams*, 2018 WL 2465763 at *4 n.6 (S.D. Miss. June 1, 2018) (discussing the importance of gender diversity within the legal profession).

There is an obvious social value in promoting diversity within the ranks of the legal profession. Historically, there has been a dearth of diversity within the legal profession. Although progress has been made, statistics reflect that today, still just one tenth of lawyers are people of color and just over a third are women.[9] A firm's commitment to diversity, though, does not just demonstrate that it shares with the courts a commitment to the values of equal justice under law. Rather, the intuition underlying the diversity criterion is soundly grounded in the Court's obligation to select counsel who will best represent the interests of the class. In particular, that a firm is able to field a diverse team provides some indication—albeit crude and imperfect—that the firm is one that is able to attract, train, and retain lawyers with the most latent talent and commitment regardless or race, ethnicity, gender, or sexual orientation. That intuition is recognized—and validated—by the views of a consensus of corporate general counsels of some of the leading companies in the United States, each charged with fiduciary duties to protect the interests of the absent shareholders and, on their behalf, to select counsel best able to represent the corporation. In their choice of counsel, they have emphasized the importance of a commitment to make efforts to ensure a diversity of minority and women lawyers in the associate and partner ranks.[10] There is no reason why the courts, faced with a

---

[9] Amer. Bar Ass'n, *ABA National Lawyer Population Survey: 10-Year Trend in Lawyer Demographics*, (2020).
https://www.americanbar.org/content/dam/aba/administrative/market_research/national-lawyer-population-demographics-2010-2020.pdf.
[10] Karen Donovan, *Pushed by Clients, Law Firms Step Up Diversity Efforts*, N.Y. TIMES (July 21, 2006), https://www.nytimes.com/2006/07/21/business/21legal.html.; GCs for Law Firm Diversity, *An Open Letter to Law Firm Partners*, available at:
https://www.law.com/americanlawyer/2019/01/27/170-gcs-pen-open-letter-to-law-firms-improve-on-diversity-or-lose-our-business/?slreturn=20200910163619

similar choice of selecting counsel, but this time on behalf of putative absent class members, should not consider and give weight to that same factor.

In this case, however, that factor is not outcome-determinative.  The two leading competitors both offer women in leadership positions.  One would have two women; the other would have a woman and a man.  But both firms demonstrate a commitment to diversity through their ranks.  There is no reason to think either harbors a lesser commitment to diversity and to recruiting, retaining, and promoting the most talented lawyers best able to represent the class.  A commitment to diversity is not a commitment to quotas.  *See Grutter v. Bollinger*, 539 U.S. 306, 334 (2003) (rejecting the use of racial quotas in the race-conscious affirmative action context while recognizing a compelling interest in promoting diversity).

Second, the Court considers the New York residence of the competing applicants. Private clients bringing or defending an individual lawsuit in New York frequently seek out counsel with a long-established presence in New York.  That may be for several good reasons. Admission to the bar of the Southern District of New York requires and reflects a commitment to practice in this District and to abide by its rules and practices; it also requires an attestation of good character by a member of the bar.  See U.S. Dist. Ct. Rules S.&E.D.N.Y., Civ. R. 1.3.  At a practical level, counsel long admitted to this Court, and who plan to continue to practice in this Court, are presumptively steeped in its mores and traditions.  That provides the Court some comfort that both those who will appear in Court and those who will operate behind-the-scenes in document production and deposition will adhere to and benefit from familiarity with those traditions.  Finally, in terms of the sheer cost that will be charged to the class (in the event of recovery), a significant presence in New York for a litigation in New York against a New York defendant matters.  This case will be tried in New York, arguments and motion practice will be

in New York, and presumably many of the depositions will be taken in New York. Counsel who are in New York will be able to handle those matters without travel.[11]

Although this factor too is not dispositive, it weighs slightly in favor of the Cohen Milstein Group, in that both of the firms who are members of that group have long-established and significant New York presences.

### C.  Direct Purchaser Interim Class Counsel

The same factors that weigh in favor of appointing interim class counsel in the End-Payor Actions do not apply to the putative class action on behalf of the Direct Purchaser Plaintiffs. As a general matter, courts appoint class counsel when it certifies a class. *See* Fed. R. Civ. P. 23(g)(1) ("a court that certifies a class must appoint class counsel"). After all, until a class is certified and its size and composition determined by the court, the court cannot finally determine either whether there is a need for class counsel at all or who is best situated to be class counsel. Accordingly, "[g]enerally, courts will appoint interim class counsel only in the event that there are 'a number of overlapping, duplicative, or competing suits pending in other courts, and some or all of those suits may be consolidated,' with multiple attorneys vying for class counsel appointment." *Sullivan v. Barclays PLC*, 2013 WL 2933480, at *1 (S.D.N.Y. June 11, 2013) (quoting MCL § 21.11) (citations omitted). In the absence of such competing lawsuits, the work that otherwise would be done by interim class counsel is done by the counsel who appears on behalf of the named plaintiff seeking to represent the class. After all, "[w]hether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-

---

[11] The Court assumes that the restrictions currently imposed in connection with the Covid-19 pandemic will be lifted by the time the parties have completed motion practice.

certification settlement must seek a settlement that is fair, reasonable, and adequate for the class." Advisory Committee Note to Fed. R. Civ. P. 23(g)(2)(A); *see also* MCL § 21.11 ("If the lawyer who filed the suit is likely to be the only lawyer seeking appointment as class counsel, appointing interim class counsel may be unnecessary."). If the counsel chosen by the named plaintiff has done a capable job and demonstrated commitment to and expertise and investment in the claims of the putative class, those factors will weigh in favor of that counsel's selection as class counsel when and if a class is ultimately certified. *See* Fed. R. Civ. P. 23(g)(1)(A) (court to consider the work counsel has done in identifying or investigating potential claims in the action, the resources counsel will commit to representing the class, and "any other matters pertinent to counsel's ability to fairly and adequately represent the interests of the class"). By the same token, if counsel has failed in those respects, that experience also will weigh against counsel's continuation to represent not only the putative class but the certified class. By prematurely selecting the named plaintiff's counsel as interim class counsel, before there is any efficiency served by that selection, the Court can only be sending a message that it has prejudged the issue, granting that lawyer pride of position and perhaps unnecessarily deterring those who otherwise might be better able to represent the absent class members from entering the competition.

Those considerations determine the outcome of Gerstein & Fisher LLP and Berger Montague PC's joint application to be appointed interim class counsel here. Gerstein & Fisher LLP and Berger Montague PC are the only two law firms that have filed a putative class action lawsuit and, although they filed two lawsuits, the two are on behalf of the same party. There are no competing lawsuits. Nor have Gerstein & Fisher LLP and Berger Montague PC demonstrated that there will be any efficiency or benefit to the putative class that will be achieved by appointment of them as interim class counsel that the putative class will not enjoy by virtue of

counsel's vigorous representation of the putative class as the only lawyers on behalf of the only named plaintiff. *See Sullivan v. Barclays PLC*, 2013 WL 2933480, at *1 (denying application for interim class counsel where the applicant has "not come forward with any showing as to why their appointment as interim class counsel would be beneficial or necessary").

### III.    Order

For the foregoing reasons, it is hereby:

ORDERED that the motion to appoint Sharon K. Robertson of Cohen Milstein and Robin van der Muelen of Labaton Sucharow as Interim Co-Lead Counsel for the putative class is GRANTED.  Cohen Milstein and Labaton Sucharow will be responsible for the overall conduct of the litigation on behalf of the putative class of End-Payor Plaintiffs, including providing supervision of all class Plaintiffs' counsel in this litigation. As Interim Co-Lead Class Counsel, Cohen Milstein and Labaton Sucharow have the authority to:

a.  Promote the efficient conduct of this litigation and avoid unnecessary duplication and unproductive efforts by making and supervising all work assignments;

b.  Prepare and file the Consolidated Class Complaint on behalf of the putative class, and any subsequent pleadings;

c.  Make, brief, and argue motions;

d.  Conduct all pretrial, trial, and post-trial proceedings on behalf of the putative class and act as a spokesperson for the putative class;

e.  Conduct and coordinate discovery on behalf of the putative class consistent with the Federal Rules of Civil Procedure, including preparation (or responses to) written discovery requests and examination (or defense) of witnesses in depositions;

f.  Monitor activities of the plaintiffs' counsel to whom they delegate, when delegating with the permission of the Court, and implement procedures to ensure that schedules are met and unnecessary expenditures of time and funds are avoided by collecting from each firm regular time and expense reports;

g.  Negotiate with defense counsel with respect to settlement and other matters;

h.  Prepare any application for an award (or approval) of fees and reimbursement of expenses incurred by the putative class;

i.  Consult with and retain expert witnesses for the putative class;

j.  Negotiate with, retain, and manage relations with outside vendor(s) for the collection, processing, or review of documents and electronically stored information produced in discovery;

k.  Conduct or coordinate all negotiations with defense counsel regarding search and production protocols, manage the review of documents produced by defendants and third parties (and production of documents by the putative class plaintiffs), and implement advanced analytics for the efficient review of documents as appropriate;

l.  Coordinate and communicate as necessary with counsel for other parties in the litigation regarding any matters addressed in this Order in order to ensure efficient use of plaintiffs', defendants', and the Court's time;

m.  Ensure that all Plaintiffs' counsel and Plaintiffs are informed of the progress of this litigation as necessary; and

n.  Otherwise coordinate the work of Plaintiffs' counsel, coordinate with counsel for the End-Payor Plaintiff class, and perform such other duties as Interim Co-Lead Class

Counsel deem necessary and appropriate based upon their judgment and consideration or as authorized by further Order of the Court.

It is further ORDERED that the motions by other counsel for appointment as interim class counsel for the putative End-Payor class are DENIED.

It is further ORDERED that the motion to appoint interim class counsel for the putative Direct Purchaser class is DENIED.

It is further ORDERED that Interim Co-Lead Class Counsel may not delegate responsibility or assign legal work to other law firms without the prior approval of the Court. No firm to which to which Interim Co-Lead Counsel delegates responsibility, when delegating with the approval of the Court, may further sub-delegate the work without the prior approval of interim co-lead counsel and the Court.

It is further ORDERED that an Initial Pretrial Conference will be held on October 26, 2020 at 10:00 a.m. by TELEPHONE CONFERENCE.  At that date and time, the parties are directed to dial the Court's conference line at 888-251-2909 (access code: 2123101).

It is further ORDERED that, by October 22, 2020 at 5:00 p.m., interim class counsel for the End-Payor Actions and Defendants thereto, and counsel for the named plaintiff in the Direct Purchaser Actions and Defendants thereto, shall jointly file a single Case Management Plan and Scheduling Order which shall be filed in each of the Direct Purchaser Actions and in the consolidated End-Payor Action, No. 20-cv-5538, and shaLL include the following: (1) a uniform and identical date by which will be filed any amended complaint in the Direct Purchaser Actions and the consolidated amended complaint in the End-Payor Actions; (2) a uniform and identical date by which responsive papers will be due in both the Direct Purchaser and End-Payor Actions; (3)  a uniform and identical briefing schedule for any motions to dismiss filed in either

the Direct Purchaser or End-Payor Actions; (4) a uniform and identical schedule for discovery and post-discovery conferences and motions that will govern the Direct Purchaser and End-Payor Actions.  All deadlines for filing responsive papers are adjourned pending further order of the Court.

It is further ORDERED that by October 22, 2020 at 5:00 p.m., counsel in the Direct Purchaser Actions shall file a letter with the Court stating whether the two Direct Purchaser Actions should be consolidated.

It is further ORDERED that the End-Payor Actions be consolidated; the Clerk of Court is respectfully directed to consolidate the following cases under No. 20-cv-5538: No. 20-cv-7580; No. 20-cv-7352; No. 20-cv-5837; No. 20-cv-5813; No. 20-cv-7492; No. 20-cv-5826; No. 20-cv-7309; No. 20-cv-5901; No. 20-cv-6769; No. 20-cv-7177; No. 20-cv-6647; No. 20-cv-7296; No. 20-cv-7304.

SO ORDERED.

Dated: October 13, 2020
      New York, New York

                                        LEWIS J. LIMAN
                               United States District Judge